UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

ANTHONY E. MORGAN and
REBECCA RYANE MORGAN,

            Plaintiffs,            Case No. 1:09-cv-646

v.                                           Hon. Robert J. Jonker

PETER A. WALLIN, *et al.*,

            Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by Anthony E. Morgan, a former inmate at the Emmet County Jail, and his wife, Rebecca Ryane Morgan.[1] This matter is now before the court on defendants' motion for summary judgment (docket no. 63). Defendants' motion is unopposed. The court will dispose of this motion without oral argument. *See* W.D. Mich. LCivR 7.2(d).

    **I.**    **Plaintiffs' complaint**

Plaintiffs' complaint names five defendants: Emmet County Sheriff Peter A. Wallin (in both his personal and official capacity); Emmet County Jail Administrator Brenda K. Ford; and three unknown deputies listed as John Doe I-III. *See* Compl. (docket no. 1). In Counts I and II, Mr. Morgan has brought two claims under § 1983 alleging violations of his Eighth Amendment rights while housed at the Emmet County Jail. In Count III, Mrs. Morgan, has brought a state law claim for loss of consortium.

---

[1] At times, the court will refer to plaintiff Anthony Morgan as "Mr. Morgan" or "plaintiff." Plaintiff Rebecca Morgan will be referred to as "Mrs. Morgan" or "co-plaintiff."

The court summarized Mr. Morgan's allegations in a previous report and recommendation as follows:

> Plaintiff Anthony Morgan brings two Eighth Amendment claims. In the first, he alleges defendants were deliberately indifferent to a substantial risk of serious harm to him when they permitted another inmate to assault him. In the second, he alleges defendants were deliberately indifferent to his serious medical needs arising from the beating. A simple recitation of the allegations in this case, and the inferences that may reasonably be drawn from them, fatally undercuts defendants' contention that the plaintiff will be unable to prove any set of facts which would justify relief against the sheriff and the jail administrator.
>
> Briefly stated, the facts as set forth in the complaint are as follows: plaintiff is a black male married to a white female. His wife's sister was the girlfriend of a white racist, identified as Joel Dufresne, who went so far as to kidnap his own son (a child he had with the sister) because of the presence of plaintiff in the family. *See,* Complaint at ¶ 13. According to the Complaint, Joel [Dufresne] is identified as a National Alliance preacher and Rahowa [FN 1] member who subscribes to the brotherhood of racial holy war, has a swastika tattooed on his abdomen, and the words "White Pride" tattooed on his bicep, with a Celtic cross tattooed on his left hand.
>
> Joel [Dufresne] was arrested early in 2006 and detained at the Emmet County Jail because of the alleged kidnaping, and because he committed a first degree criminal sexual conduct offense against his girlfriend. On July 9, 2006, plaintiff was also arrested on assault charges and placed at the Emmet County Jail. The complaint states that "the Michigan State Police detective working the [Dufresne] case requested that the Emmet County Sheriff's Department keep [Dufresne] and plaintiff separated. . . [because] Joel [Dufresne] had committed a crime of violence to avoid having "niggers" in his family, to-wit, Plaintiff . . . [and] Defendants knew of Joel [Dufresne's] racial animist in general and against plaintiff in particular." Complaint at ¶¶ 16, 40, and 41.
>
> In September, 2006, [Dufresne] began serving a 50 to 75-year sentence at the Ionia Maximum Correctional Facility for eight criminal sexual conduct convictions. He was placed a security level V, essentially the highest level. Although [Dufresne] did not begin serving his sentences until a couple of months after the incident giving rise to this lawsuit, which occurred on July 16, it may easily be inferred that prior to the incident both the sheriff and the jail administrator knew they had a violent racist lodged in their facility. In fact, at one point prior to the assault, [Dufresne] had been ejected from church services at the Emmet County Jail for being disruptive.

This incident in this case occurred on July 16, 2006, when a deputy sheriff encouraged [Dufresne] to again attend religious services, notwithstanding his previous behavior. Another deputy sheriff allowed [Dufresne] to roam freely in plaintiff's proximity, even though plaintiff was the only black American to attend the church services and one of the few at the jail. The deputies watched as [Dufresne] paced back and forth near plaintiff in a highly agitated state prior to his racially motivated attack on plaintiff.

At the conclusion of the service, while plaintiff was sitting and waiting to be dismissed, [Dufresne] blindsided him by punching him several times in the face. As a result of the attack, for which no deputies offered plaintiff any first aid, he bled from his nose and mouth and slipped in and out of consciousness, and then had a seizure. Plaintiff was transported by ambulance to a Petoskey hospital, and during this trip had two additional seizures. Plaintiff had a fourth seizure in the hospital emergency room. Plaintiff's lips were swollen, the inside of his mouth was severely cut, and he lost a tooth. Further details of plaintiff's injuries are discussed below.

*   *   *

Similarly, plaintiff has alleged that the defendants were deliberately indifferent to his medical needs. Plaintiff states that due to the beating, he suffered swollen lips, tremors, headaches which are triggered by sunlight, falling due to loss of balance, loss of a tooth, poor short term memory, and left side weakness. Notwithstanding these conditions, plaintiff states he was discharged from the hospital only one day after the attack, after "Emmet County Sheriff Deputies informed hospital officials that plaintiff's hospital stay was causing havoc on the jail's schedule" because two deputies had to guard the plaintiff's room at all times. Complaint at ¶¶ 24 and 25. It could be reasonably inferred from these facts that defendant Ford, the jail administrator, precipitated the discharge because of her need for deputies.

Upon plaintiff's discharge, the jail stopped plaintiff's prescription medication for pain, which he had been receiving while he was hospitalized, and seized his discharge papers containing instructions for his care, and did not return them. Plaintiff complained on a daily basis that the aspirin and Tylenol he was furnished were not relieving his pain and that he wanted to return to the hospital to see a doctor. [FN 2] Plaintiff, however, never saw either the jail doctor or a doctor at the hospital.

> [FN 1] This term is sometimes used to mean Racial Holy War. It appears from the context of the Complaint that plaintiff is using the term in this sense.

3

> [FN 2] The severity of his pain was ultimately borne out by the fact that even after two weeks following his release from jail later that month, he passed out due to severe headache pain and had to be taken to the hospital to be given a shot of painkillers to relieve his headache.

Report and Recommendation at pp. 2-7 (docket no. 31).

In Count III, Mrs. Morgan alleged that the July 16, 2006 attack on her husband, which resulted in his severe injury, his hospitalization, continuing seizures, and "disorienting medications" have impaired his ability to respond as a husband in their personal and intimate relationship, enjoy the fullness of their married life around home, to contribute to the necessary labor of the home, and to provide a living and sustenance to their family. Compl. at ¶ 63. Mrs. Morgan alleged that her husband's impairments have reduced her enjoyment of life. *Id.*

## II.     Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is

4

not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Defendants' motion for summary judgment is unopposed, plaintiffs having failed to file any response to the motion. Despite the lack of a response, "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir.1991). The moving party always bears the initial burden of specifying the basis on which summary judgment should be granted and showing the absence of a genuine issue of material fact and the court is required to examine the motion to determine if that burden has been met. *Id.* at 454-55; *see also Cacevic v. City of Hazel Park*, 226 F.3d 483, 486, 492 (6th Cir.2000). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

### III. Claims against Sheriff Wallin in his official capacity

Mr. Morgan seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws

5

of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Under Michigan law, the policies of the sheriff and the jail administrator regarding the operation of the jail are attributable to the county. *Rushing v. Wayne County*, 436 Mich. 247, 260, 462 N.W.2d 23, 29 (1990). To the extent that plaintiffs' action is against Emmet County Sheriff Wallin in his official capacity, it is nothing more than a suit against Emmet County itself. *Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007), *citing Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To sustain a § 1983 action against the county, plaintiff must demonstrate that the county engaged in a policy or custom in violation of his constitutional rights.

> Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), county liability is limited to situations in which the deprivation of constitutional rights results from an official policy or custom of the county. The mandate of Monell and its progeny requires (1) that a municipality be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, 98 S.Ct. 2018, and (2) that there be an "affirmative link between the policy and the particular constitutional violation alleged," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

*Petty*, 478 F.3d at 347.

Plaintiffs have neither alleged nor identified any official Emmet County policy or custom which supports their § 1983 claims. Accordingly, Sheriff Wallin is entitled to summary judgment with respect to the official capacity claims.

### IV. Plaintiff Anthony Morgan's Eighth Amendment claims

#### A. Sheriff Wallin and Jail Administrator Ford's claims of qualified immunity

Government officials have qualified immunity from suit under § 1983 for damages arising out of the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, -- F.3d --, 2011 WL 191951 at *4 (6th Cir. Feb. 1, 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816 (2009). The court may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case. *Id.*

> When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. The plaintiff has the burden of showing that a right is clearly established. However, the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time. While the facts are normally taken as alleged by the plaintiff, facts that absolutely contradict the record will not be considered as claimed by the plaintiff.

*Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (internal citations omitted).

### B. Plaintiff Anthony Morgan's claim that Sheriff Wallin and Jail Administrator Ford failed to protect him from jail inmate Dufresne

Mr. Morgan has failed to demonstrate that defendants violated a constitutional right. In order to prove liability under the Eighth Amendment for a prison official's failure to protect, an inmate must demonstrate that the official was deliberately indifferent to a substantial risk of serious harm to the inmate. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). Here, the record reflects that plaintiff was a pre-trial detainee at the Emmet County Jail in July 2006.[2] Although the Eighth Amendment applies specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees. *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005). *See Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 127 (1992) ("the Due Process Clause of its own force requires that conditions of confinement satisfy certain minimal standards for pretrial detainees").

To demonstrate deliberate indifference, the inmate must present evidence from which a trier of fact could conclude that the official was subjectively aware of the risk and disregarded it by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 829. "[A]wareness can be demonstrated through 'inference from circumstantial evidence,' and a prison official cannot 'escape liability'. . . by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [plaintiff] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 842-43; *Greene v. Bowles,* 361 F.3d 290, 294 (6th Cir. 2004). However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately

---

[2] Mr. Morgan testified that he was arrested during a domestic dispute on July 9, 2006, one week before the alleged assault. Anthony Morgan Dep. at pp. 50-53 (docket no. 65-5).

was not averted." *Farmer*, 511 U.S. at 844. Finally, "[a]llegations of *respondeat superior* do not sustain a § 1983 claim against state employees in their individual capacities, meaning that officials are personally liable for damages under that statute 'only for their own unconstitutional behavior.'" *Colvin v. Caruso*, 605 F. 3d 282, 292 (6th Cir. 2010), quoting *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir.1989).

For Mr. Morgan's claim to succeed, he must demonstrate that Sheriff Wallin and Jail Administrator Ford were aware of the risk posed by Dufresne and disregarded that risk by failing to take reasonable measures to abate it. Plaintiff's claim arises from a single incident which occurred during a religious service. A surveillance video of the incident shows that plaintiff was in a room with approximately 19 male and female inmates dressed in orange uniforms and two individuals who appeared to be non-prisoners. *See* DVD recording (docket no. 65-3). Plaintiff appears to be the only African American in the room. *Id.* Two uniformed deputies were present in the hallway adjacent to the room. *Id.* The video shows that plaintiff was sitting in a chair with reading material, when, without apparent provocation, an individual (presumably Dufresne) approached plaintiff and struck him twice in the face. *Id.* A uniformed deputy immediately grabbed the assailant (Dufresne) and escorted him out of the room. *Id.* There is no evidence that Dufresne was roomed with plaintiff or had any contact with plaintiff before the assault. In this regard, plaintiff testified that he did not know Dufresne was in the jail until after the attack. Anthony Morgan Dep. at pp. 124-25.

The video supports plaintiff's claim that he was assaulted in the room. However, Mr. Morgan has not presented any evidence to establish that defendants were either aware of the risk posed by Dufresne or that they failed to take reasonable steps to abate the risk. Plaintiff contends

that defendants were aware of the risk for two reasons. First, at his deposition, plaintiff testified that his father-in-law told him that the State Police wanted to keep him separated from Dufresne because the police thought that plaintiff would compromise the criminal investigation involving Dufresne. *Id.* at pp. 114-16. However, other than this hearsay statement from the father-in-law, there is no evidence that the State Police advised the Emmet County Sheriff's Department to separate plaintiff and Dufresne. In addition, there is no evidence that the State Police warned anyone at Emmet County that Dufresne was a racist or White Supremacist who posed a danger to plaintiff. Defendants point out that Mr. Morgan did not identify Dufresne as an enemy when he was booked into the jail. *See* Anthony Morgan Booking Form (docket no. 66-3) (jail record indicating that plaintiff stated that he had "no enemies"). This record is consistent with Mrs. Morgan's testimony that while Dufresne avoided them, he never physically challenged Mr. Morgan. Rebecca Morgan Dep. at pp. 65-69.

Second, plaintiff contends that defendants should have known that Dufresne posed a threat to him because of his tattoos, which are indicative of racial animus. The Emmet County Jail records indicate that Dufresne was booked into the jail on March 10, 2006, and indicated the following marks: "LT HAND/CROSS STOMACH/SWASTAKA [sic] LT SHOULDER/SKULL." Dufresne Booking Information (docket no. 66-1). Plaintiff testified that the Sheriff's Department knew that Dufresne posed a risk because he (plaintiff) was a black man and Dufresne had Aryan tattoos and a history of participating in Aryan rallies. Anthony Morgan Dep. at p. 157. While plaintiff testified that a female detective from the Michigan State Police knew about Dufresne's racist background, there is no evidence that the detective advised either defendant of this history. Furthermore, when asked why Sheriff Wallin and Jail Administrator Ford were responsible for

10

placing him at risk with Dufresne, Mr. Morgan asserted that defendants "had the responsibility to know," i.e., that they are responsible for the acts of all jail employees. *Id.* at p. 186-87. Mr. Morgan's claim against defendants fails because is based solely on a theory of *respondeat superior*. *See Colvin*, 605 F. 3d at 292; *Leach*, 891 F.2d at 1246.

Viewing the evidence in the light most favorable to plaintiffs, the court concludes that defendants are entitled to summary judgment on this claim. There is no evidence that either Sheriff Wallin or Jail Administrator Ford had facts available to them from which they could draw an inference that Dufresne posed a substantial risk of serious harm to plaintiff, or that defendants actually drew that inference. Absent either of these factors, there was no constitutional violation. Accordingly, Sheriff Wallin and Jail Administrator Ford are entitled to summary judgment on this claim.

### C. Plaintiff Anthony Morgan's claim that Sheriff Wallin and Jail Administator Ford were deliberately indifferent to his serious medical needs

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). Thus, the federal constitution would protect plaintiff from defendants' deliberate indifference to his serious medical needs, regardless of whether he was an inmate or a pretrial detainee. A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834. A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and

11

if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Defendants do not dispute that Mr. Morgan suffered injuries to his face, was transported to a hospital, and suffered intermittent seizures during that time. The medical record reflects: that plaintiff was transported to the hospital on July 16, 2006; that he had a swollen lip (no

sutures required); that he complained of pain behind the right eye; that he suffered from "probably pseudoseizures" after the assault; that he was kept at the hospital for over night observation; that he received a CT scan showing no abnormalities; and, that his blood work was normal other than a positive showing of cannabis. Anthony Morgan Medical Records (Exh. I) ( docket no. 71). The medical records noted relevant history, i.e., "he did get hit on the head with a limb on his left forehead about one month ago and did not seek medical attention." *Id.* The hospital provided two recommendations, i.e., "[n]o treatment is needed with anticonvulsant at present" and "[i]f further clinical suspicion of seizures would get 24 hour ambulatory EEG as an outpatient." *Id.* He was released the next day, with instructions to take "Tylenol as needed for pain." *Id.*

There is no evidence that Sheriff Wallin or Jail Administrator Ford took any part in plaintiff's medical care after the assault. There is no evidence that he was prematurely discharged from the hospital. While Mr. Morgan claims that he was denied prescription medication when he returned to the jail, he could not identify any medication prescribed by hospital staff. Anthony Morgan Dep. at pp. 141-42. Contrary to the allegations in his complaint, the medical records do not reflect that plaintiff was prescribed medication for use when discharged from the hospital. Rather, he was instructed to take Tylenol as needed.

Plaintiff had no contact with Sheriff Wallin regarding his medication. In fact, plaintiff did not recall talking to the sheriff during his incarceration in July 2006. *Id.* at p. 153. While plaintiff spoke to Jail Administrator Ford on one occasion regarding a protective order pertaining to his daughter, he had no specific recollection of requesting pain medication from her. *Id.* at pp. 153-55. Rather, plaintiff testified that he was "pretty sure" he spoke with her, because he "asked everybody" at the jail for medication and she was the only slender female working at the jail.

13

*Id.* at pp. 154-55. Plaintiff later testified that he asked Ford for pain medication and she told him, "I'll be back with it." *Id.* at p. 155. When pressed on the issue plaintiff said that he was not "100 percent" sure that he spoke with her. *Id.* at p. 156. Thus, plaintiff's own testimony does not establish that he asked Jail Administrator Ford to provide him with pain medication. At most, plaintiff's testimony establishes that on an unspecified date in July 2006 he might have asked Ford for pain medication (presumably Tylenol) and that Ford might have said that she would get back with him. This evidence does not establish deliberate indifference to a serious medical need.

Viewing the evidence in the light most favorable to Mr. Morgan, there is no evidence that either Sheriff Wallin or Jail Administrator Ford were involved in his healthcare, let alone that these defendants were deliberately indifferent to his serious medical needs. Accordingly, Sheriff Wallin and Jail Administrator Ford are entitled to summary judgment on this claim.

### IV. Mrs. Morgan's state law claim for loss of consortium

"Michigan law clearly recognizes the right of a person to recover damages for loss of consortium caused by injuries wrongfully inflicted upon that person's spouse." *Ledsinger v. Burmeister*, 114 Mich. App. 12, 26, 318 N.W.2d 558 (1982), citing *Montgomery v. Stephan*, 359 Mich. 33, 101 N.W.2d 227 (1960). While "[l]oss of consortium technically means the loss of conjugal fellowship," it also includes "loss of society, companionship, service, and all other incidents of the marriage relationship." *Washington v. Jones*, 386 Mich. 466, 472, 192 N.W.2d 234 (1971). Under Michigan law, a claim for loss of consortium is an independent cause of action under the common law which is derivative of the spouse's own cause of action. "[T]his Court has long recognized that a claim for loss of consortium is an independent cause of action. Although a loss-of-consortium claim is derivative of the underlying bodily injury, it is nonetheless regarded as

14

a separate cause of action and not merely an item of damages." *Wesche v. Mecosta County Road Commission*, 480 Mich. 75, 85, 746 N.W.2d 847 (2008) (internal citations omitted). *See, e.g.*, *Sove v. Smith*, 255 F.2d 264, 267 (6th Cir. 1966) (observing that under Michigan law as expressed in *Montgomery*, *supra*, "although the action for loss of consortium was an independent cause, it was derivative and could not succeed if the husband's own cause was barred by his contributory negligence"); *Cebulski v. City of Belleville*, 156 Mich. App. 190, 192-93, 401 N.W.2d 616 (1986) (characterizing the wife's loss of consortium claim as derivative of the husband's § 1983 claim).

As previously discussed in § III, *supra*, Mr. Morgan's civil rights claim under § 1983 fails. Because Mrs. Morgan's loss of consortium claim is derivative of her husband's § 1983 claim, her claim also fails. *See Sove*, 255 F.2d at 267; *Wesche*, 480 Mich. at 85; *Cebulski*, 156 Mich. App. at 192-93. Accordingly, Sheriff Wallin and Jail Administrator Ford are entitled to summary judgment on this claim.

### V. Recommendation

For these reasons, I respectfully recommend that defendants' motion for summary judgment (docket no. 63) be **GRANTED**.

Dated: March 2, 2011                             /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).